UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FERNANDO TENORIO,

    Petitioner,

v.                                     CASE NO: 8:03-CV-2558-T-30MSS
                                       Crim. Case No: 8:00-CR-117-T-MSS

UNITED STATES OF AMERICA,

    Respondent.
_____/

## ORDER

THIS CAUSE comes before the Court upon Petitioner's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255 (CV Dkt. #1) filed on December 8, 2003. Petitioner (hereinafter referred to as "Petitioner" or "Tenorio") is a federal inmate proceeding *pro se* in this matter. The Government filed its Response (Dkt. #7), to which Petitioner has replied (Dkt. #16). For the reasons set forth herein, Petitioner's motion will be denied.

### Background

The following background of this case is taken from the Eleventh Circuit Court of Appeal opinion entered on July 17, 2003, in the direct appeal of the underlying criminal case, United States v. Quinones, ____ F. 3d ____, 2003 WL 21803292 (11th Cir. 2003), appeal number 01-14142:

> In the early 1990's, Jose Castrillon-Henoa and Pedro Navarette operated a cocaine transportation business from their fishing company in Buenaventura, Colombia. Vessels from their company traveled from Buenaventura to 200 to 300 miles off the coast of Equador, where the crews would retrieve cocaine

that had been dropped from airplanes into the sea. The vessels usually carried cement mix to seal compartment areas later where the cocaine was hidden. The vessels laden with cocaine then sailed for the coast of Mexico. Cocaine smuggled along the Castrillon-Henoa/Navarette route was ultimately destined for the United States.

By 1998, the delivery method changed slightly in that the drugs were transported offshore by speed boats, where the drugs were then transferred to small vessels; the vessels in turn would deliver the drugs to larger vessels. The larger vessels then sailed north to Mexico, where the drugs were transferred to Mexican fishing vessels.

On 4 April 2000, the *U.S.S. John A. Moore* – a United States Navy frigate – was patrolling the coastal areas of Ecuador and Colombia. A seven-member Coast Guard Law Enforcement Detachment Team from San Diego was aboard the *Moore*. A helicopter from the *Moore* returned with videotape of the *LayneyD* going northeast along the smuggling corridor. The *LayneyD* was riding low in the water as if carrying cargo and listing to one side. A skiff was tied topside of the *LayneyD*. The *LayneyD* is a fishing vessel; no fishing activity was seen. The *LayneyD* flew no national flag. The Coast Guard team determined that the *LayneyD* displayed smuggling characteristics.

Upon reestablishing visual contact with the *LayneyD*, the Coast Guard attempted radio communications with her crew. When the Coast Guard team asked who was speaking on the radio, only incomprehensible answers were made. Quinones eventually identified himself as the master of the vessel. When asked about the name of the vessel, the Coast Guard saw a crewmember of the *LayneyD* lean over the bow to read the name of the vessel. Quinones was also evasive and inconsistent with his answers about the ship's destination and purpose of voyage.

The Coast Guard team noticed that no fishing equipment was visible on the *LayneyD*, except for a gill net. The skiff was relocated from the topside of the *LayneyD* to tethered alongside her. The Coast Guard team worried that the crew of the *LayneyD* might try to scuttle the vessel to destroy evidence that might be aboard.

The Coast Guard team contacted its command center about boarding the *LayneyD*. The government of Colombia granted authorization to board the *LayneyD*. The vessel – due to weather – was boarded the next morning. The vessel was then located approximately 290 miles southwest of Equador in the

Pacific Ocean. Upon boarding, the crew of the *LayneyD* was mustered on the stern of the vessel. The Coast Guard team noticed that the *LayneyD* was carrying bags of cement, rocks, and sand and a cement spreader. These things are unusual for a fishing vessel.

Petty Officer Cook of the Coast Guard team was previously assigned to a team dealing with fisheries and received training at the National Maritime Fisheries Service. From his training, Petty Officer Cook expected to find certain things aboard a vessel if used for fishing: fishing equipment, a large quantity of ice, and a large quantity of fish (based on the *LayneyD*'s time at sea). All of these items were absent from the *LayneyD*. The little fishing equipment that was aboard was rusted, damaged, unlubricated, and clearly unused. Petty Officer Cook later testified – in essence – that the *LayneyD* was too poorly equipped to be suitable to her fishing purpose.

Because the fuel tanks are a common location for hiding drugs, the Coast Guard queried Arroyo about the fuel tanks. Arroyo pointed out the location of the aft fuel tanks; and when asked directly, Arroyo indicated there was nothing in the starboard aft fuel tank. When the Coast Guard investigated the starboard aft fuel tank, they noticed an altered access plate to the tank and an unusual mesh material inside the sounding tube (a protruding pipe from the fuel tank used to measure the fuel quantity). The Coast Guard team inserted a metal rod into the sounding tube, and upon its extraction, they discovered a white powdery substance that later field-tested positive for cocaine. The crewmembers were placed in handcuffs.

Quinones was still piloting the *LayneyD*. When the Coast Guard informed Quinones they had found cocaine on the vessel, Quinones nodded his head and answered, "Yeah, I know." Quinones then indicated – by way of a sketch – where more cocaine was located on the vessel. Quinones also provided the coordinates where the *LayneyD* was to meet with another vessel.

The Coast Guard found a patch of fresh, wet concrete that covered a hatch; beneath the hatch was more cocaine. The *LayneyD* was carrying 2,943 kilograms of cocaine, worth more than $40,000,000 wholesale in the United States. The Coast Guard team notified its command center of the discovery and sought a statement of "no objection" from Colombia to the seizure. The team was given permission to detain the vessel and to bring it to the Coast Guard base in St. Petersburg, Florida.

A jury convicted Defendants on both counts of the indictment and further found that the offenses involved five kilograms or more of cocaine. Quinones was sentenced to 360 months' imprisonment; Arroyo, Ocampo, Dominguez, and Tenorio were sentenced to 252 months' imprisonment; and Urdin was sentenced to 235 months' imprisonment.

(Tenorio was sentenced on August 2, 2001.)

The issues on appeal were:

(1) The trial court erred in denying the motion for judgment of acquittal based upon insufficient proof of knowledge;

(2) The trial court erred in failing to dismiss the indictment because it lacked subject matter jurisdiction;

(3) The trial court erred in failing to dismiss the indictment due to a violation of the agreement between the United States and Colombia to suppress illicit traffic by sea;

(4) The trial court erred in failing to dismiss the indictment due to the fact that 46 U.S.C. §1903 is unconstitutional;

(5) The trial court erred in denying the motion to suppress based upon articulable suspicion;

(6) The trial court erred in failing to dismiss the indictment because 46 U.S.C. §1903 unconstitutionally removes the element of a "vessel subject to the jurisdiction of the United States" from the jury; and

(7) The trial court erred in failing to reduce the Appellant's sentence based upon "minimal" or "minor" participant.

The Eleventh Circuit affirmed the trial court in all respects.

Tenorio then timely filed this §2255 motion raising the following issues:

(1) The petitioner is actually innocent of the charges against him because he did not have knowledge of the conspiracy to import the drugs to the United States or the intent;

(2) The United States government is without subject matter jurisdiction in international waters;

(3) The petitioner received ineffective assistance of counsel when counsel failed to request a jury instruction on knowledge and intent; and

(4) The petitioner further received ineffective assistance of counsel when his appellate counsel failed to pursue the issue of a jury instruction on knowledge and intent.

## **Discussion**

Claims one, three and four were considered on direct appeal and are not appropriate for §2255 relief. Petitioner acknowledges as much in his reply brief where he states on page four:

> The government is correct in the claim that prior resolution bars re-consideration of Petitioner's claim of actual innocence based on a claim that Petitioner did not have knowledge of the conspiracy to import drugs into the United States. Petitioner cannot re-litigate that point on §2255 motion, and his inmate "counsel" should have known this. Also, Petitioner's claims regarding the jury instructions is without merit, at least as to the knowledge element on guilt/innocence.

Grounds raised in issues one, three and four, therefore, will be denied.

Ground two challenges this Court's subject matter jurisdiction in international waters. This ground, too, was raised by Petitioner on direct appeal. The Eleventh Circuit rejected this contention citing United States v. Tinoco, 304 F. 3d 1088 (11th Cir. 2002) and said in footnote two:

> Defendants claim the MDLEA is unconstitutional on its face because – in the light of Apprendi v. New Jersey, 120 S.Ct. 2348 (2000) – the statute permits an increase in maximum punishment based on a drug quantity without an allegation in the indictment or a beyond-a-reasonable-doubt finding by the petit jury about the drug quantity. Defendants also claim that the MDLEA is facially unconstitutional because the element of jurisdiction by the United States over a vessel in international waters was not submitted to the jury. As a corollary to that argument, Defendants claim the district court erred when it instructed the jury that Defendants' vessel was subject to the jurisdiction of the United States as a matter of law. These arguments are foreclosed by our decision in United States v. Tinoco, 304 F. 3d 1088 (11th Cir. 2002), and we decline to address them further. Defendants also argue that jurisdiction is lacking because no criminal charges were pending against Defendants in the United States, which – according to Defendants – is a prerequisite to jurisdiction under the "Agreement Between the Government of the United States of America and the Government of the Republic of Colombia to Suppress Illicit Traffic by Sea." Statutory jurisdiction in this case is correctly premised on the consent extended by Colombia. 46 U.S.C. app. § 1903(c)(1)(C)("flag nation has consented or waived objection to the enforcement of United States law by the United States . . ."). And – under the statute – Defendants have no standing to contest the consent given by Colombia. 46 U.S.C. app. § 1903(d).

Apparently realizing that this jurisdictional ground had no merit, Petitioner attempts to shoe-horn a Blakely/Booker argument into ground two. Petitioner had previously sought permission to supplement his §2255 motion to add a Blakely argument, but that request was denied because it was futile. This Court pointed out that Blakely was not retroactive to cases on collateral review like Petitioner's citing Varella v. United States, 400 F. 3d 864 (11th Cir.

2005).  Petitioner seeks to circumvent that ruling saying now that it is <u>Booker</u> that he seeks to have applied retroactively:

> In fact it is BOOKER that petitioner seeks to have this Court consider being applied retroactively to cases on collateral (sic), and the reasons for such requests are justiciable, even in light of the short treatment given by the Eleventh Circuit in VARELA.

Petitioner's reply brief, page 5.

This attempt to again add this claim is denied because it is directly contrary to the previous order of this Court and because it is legally wrong.  The Eleventh Circuit has already rejected this argument in the direct appeal of this case.  (See footnote two quoted above.)  Additionally, the Eleventh Circuit has addressed this issue, and rejected it, in <u>United States v. Shelton</u>, 400 F. 3d 1325 (11th Cir. 2005).  At sentencing, Tenorio maintained his claim that he had no knowledge of the conspiracy and no knowledge of the drugs on board.  He did not dispute the quantity as calculated in the presentence report (PSR), but he did dispute that he had any knowledge of their presence.  But knowledge was an issue for the jury and the jury found against Tenorio in that regard.  The jury found that he was part of the conspiracy and that he possessed five kilograms or more of cocaine.

Further, even if there were sentencing error, Tenorio is unable to show that the error was "plain."  As the Eleventh Circuit said in <u>Shelton</u>, <u>Booker</u> error exists when the district court misapplies the guidelines by considering them as binding as opposed to advisory. <u>Shelton</u>, 400 F. 3d at 1331.  It is the Petitioner's burden to show that the Court considered them binding, and then show prejudice.  That is, a defendant must show that the Court

considered the guidelines as mandatory and would have given a different sentence if the guidelines had been considered advisory.

To establish that there would have been a different result takes something more than showing that the district court's sentence was within the guidelines range, especially since the guidelines range remains an important factor in sentencing. A defendant must point to something in the record to support a claim that there would have been a different sentence. Here, Tenorio points to nothing in the record, nor can he because this Court has never considered the guidelines to be mandatory.

For all of these reasons, the motion to vacate will be denied.

It is therefore ORDERED AND ADJUDGED that:

1. Petitioner's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. §2255 (CV Dkt. #1) is DENIED.

2. The Clerk is to enter judgment for Respondent, United States of America, terminate any pending motions, and close this case.

**DONE** and **ORDERED** in Tampa, Florida on May 17, 2006.

*/s/ James S. Moody, Jr.*
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

F:\Docs\2003\03-cv-2558.Tenorio deny 2255.wpd